IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 24, 2021 Session

## STATE OF TENNESSEE v. CHRISTOPHER NICOL COX

**Appeal from the Criminal Court for Scott County**
**No. 11387     E. Shayne Sexton, Judge**

_____

### No. E2020-01388-CCA-R3-CD
_____

FILED

02/03/2022

Clerk of the
Appellate Courts

Defendant, Christopher Nichol Cox, was convicted by a jury of eighty-one counts of aggravated sexual battery, one count of rape of a child, and one count of continuous sexual abuse of a child. The trial court merged the convictions for aggravated sexual battery and rape of a child into the conviction for continuous sexual abuse of a child and imposed a sixty-year sentence as a Range III offender to be served at 100%, by operation of law, in the Department of Correction. On appeal, Defendant argues that: the trial court erred by denying his motion for a continuance; the trial court erred by allowing the victim to testify with the aid of a therapy dog without a hearing to determine the animal's training or necessity to the victim's testimony; the trial court improperly bolstered the victim's testimony by allowing the victim's entire forensic interview to be played to the jury; the trial court erred by failing to grant a mistrial when a witness testified that Defendant had other cases and that there were other victims; the evidence was insufficient to support his conviction for rape of a child and thirty of the counts of aggravated sexual battery; the jurors did not make a unanimous decision as to which acts of sexual abuse it relied on to support his continuous sexual abuse of a child conviction; the trial court improperly enhanced his sentence by relying on an enhancement factor that is an essential element of the offense; and the cumulative effect of repeated constitutional errors denied him a fair trial. After hearing oral arguments and following our review of the record and the briefs of the parties, we conclude that the evidence was insufficient to support the convictions of aggravated sexual battery in counts sixteen through twenty-seven, counts forty-eight through fifty-four, and counts sixty-five through eighty-one and accordingly dismiss those counts and remand for entry of amended judgments. In all other respects, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed
in Part; Reversed in Part; Remanded**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, and ROBERT H. MONTGOMERY, JR., JJ., joined.

Emily W. Wright (on appeal), Jamestown, Tennessee, and Ashley King-Kidd (at trial), Oneida, Tennessee, for the appellant, Christopher Nicol Cox.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Jared Effler, District Attorney General; and Jordan Howanitz and Lindsey Cadle, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

This case arises from the sexual abuse of the minor victim by Defendant during a period of time from September 11, 2013, until December 13, 2016. The Scott County Grand Jury returned an indictment against Defendant charging him with nine counts of aggravated sexual battery and one count of continuous sexual abuse of a child. The State later obtained a superseding indictment charging Defendant with eighty-one counts of rape of a child, one count of aggravated sexual battery, and one count of continuous sexual abuse of a child.

*State's Proof at Trial*

Initially, in order to protect the minor victim, she will be referred to solely throughout this opinion as "the victim." Because the victim was a minor at the time of the offenses, we will refer to the victim's mother and other members of the victim's immediate family by their initials in order to further protect the victim's identity. The twelve-year-old victim testified that she had lived in Kentucky with her grandparents and two younger siblings since October 2018. She previously lived in Tennessee with her aunt and uncle and three siblings, including her older sister. The victim testified that after her seventh birthday in 2013, while living with her aunt and uncle, she began regularly visiting her biological mother, J.W. The victim's mother was living with Defendant at the time, and no one else lived in the house. Depending on the weather and her school schedule, the victim visited J.W. between one and three times per week. She enjoyed playing video games and riding a "four-wheeler" ("ATV") during her visits. The victim testified that she enjoyed a little more freedom with J.W. and Defendant than she had with her aunt and uncle.

The victim testified that during one of the visits with J.W. and Defendant, she recalled sitting on Defendant's knee on the "green couch" watching television when Defendant "reached his hand around and touched [her]" in the "lower bathing suit area."

- 2 -

The contact lasted for a "couple of seconds," and made the victim feel uncomfortable. The victim testified that Defendant touched her another time while in the living room, and his fingers went in between the folds of her vagina. She recalled another incident during which she and Defendant were watching the movie "Deadpool" while lying either on the couch or on an air mattress. The victim testified that Defendant touched her "lower bathing suit area" underneath her underwear with his hand. She said, "For a minute he tried to move it up and down and then he once tried to stick it in, and I told him no." The victim testified that Defendant then stopped. Again, this made the victim feel uncomfortable. She specifically remembered the "Deadpool" incident because Defendant attempted to insert his finger in her vagina. She testified that she could not remember how many times "bad things" happened to her on the green couch, but when asked about the specific number of times, she said it was more than ten, but not more than fifteen times. On cross examination, she explained how she knew it happened between ten and fifteen times. "Knowing of how many times I had visited there between the three years of a span that I had known him, 10 to 15 would be as much as I was close enough to him to have these touches occur with him."

The victim testified that Defendant also touched her in the bedroom where she slept when visiting J.W. and Defendant. She said that Defendant sometimes came into the bedroom and lay down with her. He would touch her "lower bathing suit area" with his hands. The victim testified that Defendant sometimes touched her over her clothing and sometimes underneath her clothing and underwear, and he moved his hand "up and down." The victim testified that she recalled a specific incident in the bedroom when Defendant touched her "private," but she did not recall him go into the crevices of her "lower bathing suit area." This made her feel uncomfortable. When asked if Defendant touched her more than twenty times in the bedroom, the victim replied: "Around in that area." The victim testified that her sister or Defendant's son would sometimes be sleeping in the room when Defendant touched her. She occasionally pretended to be asleep when he touched her. The victim testified that the majority of the touchings occurred in the bedroom and on the couch and that it happened more than once in a day. She also testified that it happened more than once in a day, on some occasions, it would happen on the couch and also in the bedroom, and "more than likely" on some days, it happened twice on the couch and twice in the bedroom.

The victim testified that she liked riding the ATV, which was purchased in March 2016. The victim was not allowed to drive the ATV alone, and she always rode with either J.W. or Defendant. She testified that she rode the ATV at least three to four times a week depending on how long she was there to visit J.W. and Defendant. The victim and Defendant rode alone at least once every time that she rode the ATV.

The victim testified that she and Defendant rode the ATV in multiple areas, and while on the vehicle, Defendant touched her in the "lower bathing suit area" with his hand. He usually touched her while she was driving. At trial, the victim marked on a map where

one of the incidents occurred because it was an area where "[they] would stop there and get off and walk around." She did not recall if Defendant touched her over or under her clothing during the incident, but the touching made her feel uncomfortable. The victim also marked three other areas on the map where Defendant touched her while they were riding the ATV. She specifically recalled a location on Old Brimstone Road because it was a "twisty turny road." The victim testified that in one of the areas, Defendant touched her underneath her clothing. She did not recall if he touched her over or under her clothing at the other locations. The victim initially testified that she did not remember how many times defendant touched her while they traveled on the road, but when asked if it was more than ten, she replied, "It would be at least ten or under."

The victim testified that on one occasion, she went to Walmart with her mother, younger sister, and Defendant. While they were in a clothing aisle, Defendant touched her "[l]ower bathing suit area." The victim did not recall if Defendant touched her over or under her clothing or if anyone saw it happen.

The victim testified that she first spoke with someone from the Department of Children's Services ("DCS") when she was in third or fourth grade She did not tell them everything that happened because she was embarrassed or "kind of ashamed." The victim said that she did not previously tell anyone about the incidents because she thought that no one would listen or believe her, and she was afraid. The victim testified that she did not tell anyone when Defendant attempted to put his finger in her vagina because she was afraid that she would "get in trouble and stuff." Defendant also told her that she would get in trouble if she told anyone what happened and that she would never see her mother again. The victim could not recall a time when she visited J.W. and Defendant that he did not touch her "lower bathing suit area." She said that there were a couple of days to a week between most of the incidents. The victim was not sure if J.W. ever saw anything. She said that J.W. would be asleep, in the bathroom, or gone when Defendant touched her. The victim testified that all of the incidents occurred after her seventh birthday in 2013 and before December 2016. Regarding the frequency of the touchings, the victim testified as follows:

Q. And were there ever times that you were over there that [Defendant] was there and he didn't touch your vagina – touch your lower bathing suit area?
A. Not that I can remember.
Q. Could it have happened?
A. More than likely, not so.
Q. Okay. Would there be at some point every time you were over there that you were alone with [Defendant] for whatever reason?
A. Yes.
…
Q. Do you ever remember a time of going over there on these visitations where he did not touch you – touch your vagina?
A. Not that I can remember.

On cross-examination, the victim recalled speaking to several DCS case workers, and there was one conversation with a DCS worker at school. She also spoke with "Ms. Sunny" at "The Children's Center." The victim did not recall if she told Ms. Sunny that Defendant touched her skin or that Defendant only touched her over her clothing. The victim testified: "I'm pretty sure I told her that I was positive he had touched me before." She did not remember specifically what she told Ms. Sunny. The victim also did not recall telling anyone from DCS that Defendant had never done anything to make her feel uncomfortable. She did not remember testifying at the preliminary hearing that Defendant always touched her over her clothing. The victim then read from the preliminary hearing transcript where she testified that she remembered Defendant touching her on the outside of her clothing. However, the victim testified at trial that Defendant touched her "both on top and under" her clothing. The victim also testified that she visited J.W. weekly from 2013 to 2016. When asked if she remembered Defendant's hand being inside her one time, she said, "Close to it but not fully in." The victim further clarified, "Like he tried to, but it didn't like go all the way."

The victim recalled that J.W. was hospitalized for a period of somewhere between two and three months during the summer of 2016. She did not remember if she saw Defendant during that time. The victim testified that her mother and siblings were on the other side of the aisle, almost in another aisle, when Defendant touched her in Walmart. She did not tell J.W. about the times that Defendant touched her because J.W. and Defendant "fought a lot." The victim thought that the fighting would continue if she disclosed what happened, and "nothing will be – really make it better." She did not tell her aunt and uncle what happened because "just from the fact that it happened and the shame and fear of disappointment, it would make more trauma or discomfort."

The victim's forensic interview was played for the jury. During the interview, the victim repeatedly said that she did not like to talk about what happened between her and Defendant. She said that Defendant touched her "meow" and her "butt." This made her feel uncomfortable. The victim told Ms. Sunny, the forensic interviewer, that Defendant touched her "meow" more than one time. She said that Defendant first touched her while she was bouncing on his leg in the living room. The victim told Ms. Sunny that she was facing away from Defendant, and he touched her over her clothing and moved his hand around.

The victim told Ms. Sunny that J.W. was usually in the bathroom when Defendant touched the victim. She did not know if Defendant touched her skin or underneath her clothing or if he always touched her over her clothing. The victim said that Defendant touched her while they were in the living room watching television. She told Ms. Sunny that Defendant said, "let me touch you," and the victim told him, "no." The victim said that Defendant asked her "why," and she said, "because." She told Ms. Sunny that when she told Defendant no, he still asked to touch her.

The victim said that Defendant sometimes touched her while they were on the ATV. She told Ms. Sunny that Defendant wrapped his arms around her and touched her, and she told him to stop. The victim said that Defendant touched her on top of her clothing but she did not know if his hand went under her clothing. She said that Defendant attempted to put his hands inside of her clothes. The victim asserted that she told Defendant to stop, and he asked "why." She said that Defendant stopped but then he tried touching her again. The victim told Ms. Sunny that Defendant also tried to squeeze her "butt." She did not know if it was under or over her clothing. She said that this occurred in the living room while she was sitting beside Defendant.

The victim told Ms. Sunny that Defendant never showed his body to her but he walked around in his underwear. She said that Defendant never asked her to touch or kiss him. The victim also told Ms. Sunny that no one else had touched her "meow" or "butt." The victim told Ms. Sunny that she had last seen Defendant a couple of weeks before the forensic interview. She was not sure of the last time that Defendant touched her. The victim said that Defendant promised to give her money, but he never gave her any. She asserted that the money was to allow him to touch her. The victim said that she did not like Defendant's touches, and she did not know if he touched anyone else.

J.W., the victim's biological mother, testified that she began living with Defendant, whom she had met on the Internet, in 2012. She saw the victim on the weekends, and when J.W. was not working. J.W. said that the victim came to the house more often when J.W. stopped working. She testified that Defendant's son, friends, and other family members also visited the residence. J.W. testified that the victim played video games and rode the ATV when she stayed with J.W. and Defendant. She said that she usually slept in the living room, and Defendant slept in the bedroom when the victim visited them. J.W. thought that the victim either slept on the couch or in the same bedroom as Defendant. She said that her niece also slept in the room with Defendant.

J.W. testified that Defendant sometimes rode with the victim on the ATV when J.W. was unable to do so. She did not recall how many times the victim and Defendant were on the ATV alone. J.W. said that the victim and Defendant rode around the landlord's property and "through the woods and stuff."

J.W. testified that she spoke with Defendant by phone before he was arrested, and she recorded the conversation. She turned the recording over to police. During the phone call, Defendant told J.W. that he inappropriately touched the victim but that it had only been one time while they were wrestling. Defendant also asked J.W. to call her sister and brother-in-law, the victim's aunt and uncle, and ask them not to say anything about the allegations to DCS. Defendant also offered to pay the victim's aunt and uncle to stay silent. J.W. testified that at the time of the call, Defendant had left home, and she did not know

his whereabouts. She said that he had left suddenly a few days earlier with money but no belongings.

On cross-examination, J.W. testified that she did not recall if Defendant was frequently gone in 2015. She said that the victim usually visited their residence during spring break, summer break, and other times when school was out. The victim usually visited once or twice a month when school was in session. J.W. testified that she usually saw the victim more during the summer. She noted that she was hospitalized for three months during the summer of 2016. J.W. did not know if the victim visited the Defendant during that time. She admitted that she was using methamphetamine during the recorded phone call to Defendant. J.W. thought that the call was made either the night that Defendant left or the following night. J.W. admitted that she had prior felony convictions for possession with intent to resell pain medication and forgery. She was also previously convicted of theft under $500 for stealing a pair of shoes.

Deputy Casey Geisler of the Scott County Sheriff's Office testified that he was working as a corrections officer in December of 2016. He said that a warrant was issued for Defendant's arrest on December 15, 2016, and Deputy Geisler processed an inmate transfer for Defendant from Oklahoma on December 29, 2016.

At the conclusion of the State's proof, Defendant moved for a judgment of acquittal on the eighty-one counts of rape of a child, one count of aggravated sexual battery, and one count of continuous sexual abuse of a child. The trial court partially granted the motion finding that the State had introduced proof of penetration for only one count of rape of a child. The trial court further modified eighty of the rape of a child counts to the lesser-included offense of aggravated sexual battery. The motion as to the other counts was denied.

*Defendant's Proof at Trial*

T.W. the victim's aunt, testified that she had full custody of the victim from 2008 to 2016. She said that the victim visited her biological mother, J.W., from 2013 to 2016. T.W. testified that J.W. sometimes came to T.W.'s house to visit the victim and sometimes with the victim's grandparents. T.W. testified that it was within her discretion to let the victim visit with J.W. She said that the visits between J.W. and the victim were "sporadic." She noted that J.W. was hospitalized twice in 2016. T.W. testified that the victim never visited Defendant when J.W. was not present in the home. She said that the victim was living with the victim's grandparents at the time of trial.

Defendant testified that he never touched the victim in a sexual manner. He initially testified that he first met the victim in 2013, and they only met one time during that year. Defendant then opined that he may have actually first met her on her birthday in 2014. He said that the victim began seeing J.W. during the winter of 2015, and the victim visited

"very sporadically" and "maybe once a month, maybe twice." Defendant testified that he was employed by Star Construction of Knoxville in 2015 when the victim visited his and J.W.'s residence. He said that he was gone from the residence during most all of 2015 because of his job.

Defendant testified that J.W. was hospitalized for approximately three months during the summer of 2016. He said that the victim never visited him during that time and that the victim made very few visits to him and J.W. between the end of March and the beginning of June in 2016. Defendant testified that he and J.W. broke up for a period of time during the fall and winter of 2015, and J.W. began dating someone else. He said that he did not have any contact with the victim during that time. Defendant agreed that he purchased an ATV in March of 2016, which the victim rode.

When asked why he told J.W. during the recorded phone conversation that he touched the victim one time, Defendant testified:

> It's not a hard question to answer to tell you truthfully. [J.W.] - - at times, I had been stabbed, cut, almost set on fire, ran over and many times threatened that she would burn the house down on me by just cheating on her and doing, you know, odds and ends things that she thought when she was Meth'd out. At this time, she - - she got it in her head that I was doing these things because she - - I guess she heard it from somebody. And when she did, she threatened me on the several phone calls before the one that was recorded.

Defendant testified that he had told J.W. during previous phone conversations that he did not touch the victim. He said that he finally told J.W. that he touched the victim because that is what she wanted to hear, and that was the only thing that would calm her down. He agreed that he told the victim's aunt and uncle to tell the victim and the other girls not to say anything about what happened. Defendant testified:

> I told her to say that to them because I did not know the whole situation myself, and I did not know what was going on because I had not heard myself. Nobody had told me this. I was already out of town where I was - - you know, with my brother. And when I got this information, it was very shocking to me, and then my thought was, how do I - - how do I get around to somebody and say what I need to say. So the best option was to go to [J.W.] and tell her, hey tell them I'll give them this money for this - - for these accusations (sic) so that I can at least talk to them. You know what I'm saying? It wasn't no, not that I'm saying that I'm guilty. That was trying to calm the situation down so I could talk to them.

Defendant testified that he was shocked by the allegations against him and "very confused." He said that J.W. argued with him during the recorded phone call and wanted money from him. He reiterated that the only way to calm J.W. down in order for them to have a normal conversation was to "tell her what she needed to know or not needed to know but needed to hear." Defendant testified that at the time of the recorded conversation, he was visiting with his brother in Oklahoma. He claimed that he went to Oklahoma because he and J.W. had been fighting and that he learned of the accusations against him after he arrived in Oklahoma.

On cross-examination, Defendant testified that he had previously been convicted of burglary in Scott County. He said that the victim visited his and J.W.'s residence approximately twenty times from 2015 until Defendant left in December 2016. Defendant denied having a green couch in the home and said that the couch was actually white and beige, "like a Calico type color." He agreed that he and the victim played video games and watched movies while sitting on the couch. Defendant denied watching the movie "Deadpool" with the victim. He agreed that the victim sometimes slept in the bed with him when she visited. Defendant testified that he thought of the victim as his own child.

Defendant testified that the victim liked spending time with J.W. and playing video games with her. Defendant agreed that the victim loved the ATV, and he rode it alone with her sometimes. He demonstrated on a map the places where he and the victim rode, including Low Gap Road. Defendant testified that he always sat behind the victim when she drove the ATV, but he did not have his hands wrapped around her.

Defendant did not remember when he first left for Oklahoma but said that he had considered going there before he was accused of touching the victim. He denied that the victim visited him and J.W. almost every weekend, and he did not recall talking to a DCS worker on December 8, 2006. Defendant did not recall saying that the victim visited him and J.W. almost every weekend.

Defendant testified that he worked for Star Construction in 2015 and that they paid their employees in cash. Therefore, he did not have any employment records. He thought that he was employed by JDS from 2013 to 2014, and he had also worked for CSI in Knoxville. Defendant testified that J.W. threatened his life several times during their arguments, and he called the police on her. He said that he left J.W. several times, but she called him to come back. Defendant testified that he told J.W what she wanted to hear during their phone conversation, and he told her those things to calm her down. Defendant agreed that during the call he told J.W. that he sexually assaulted the victim, but would not tell her that he had a separate bank account. Defendant claimed that he lied to J.W. during the call about abusing the victim but he did not lie to her about the bank account because that would not calm her down.

Defendant testified that J.W. was a drug addict, and she needed money.  He claimed that he did not try to bribe J.W. when he offered her money, and he was only trying to calm her down.  Defendant said that he did not talk to the victim's aunt or uncle and offer to pay them.  He also said that he did not drive to their house to see them after the allegations were made against him because he had already gone to Oklahoma.  Defendant testified that he explained to J.W. during the phone call that he once left his hand "there" on the victim for too long.  Defendant testified that he left for Oklahoma at the beginning of December because his brother had helped him get a job working at a kennel.

*State's Rebuttal Proof*

Marita Bennett, a DCS investigator, testified that she initially spoke with Defendant on December 8, 2016.  She then met with the victim at school.  Defendant at first said that the victim "hardly ever" visited him and J.W. at their home, but he then said the victim visited them every other weekend.  Based on the evidence presented, the jury convicted Defendant of one count of rape of a child, eighty-one counts of aggravated sexual battery, and one count of continuous sexual abuse of a minor.

*Sentencing Hearing*

The presentence report, a Psychosexual Evaluation Report, and certified copies of Defendant's prior convictions were introduced as exhibits at the sentencing hearing.  Neither the State nor Defendant presented any other proof.  The presentence report reflected that Defendant had prior convictions for assault, for which he received judicial diversion, and burglary, for which he was on probation at the time of the offenses in this case.

Pursuant to Tennessee Code Annotated section 39-13-516(f), the trial court merged the convictions for aggravated sexual battery and rape of a child into the conviction for continuous sexual abuse of child and sentenced Defendant only as to that count to sixty years as a Range III offender to be served at 100%, by operation of law, in the Department of Correction.  It is from these judgments that Defendant now appeals.

**ANALYSIS**

*I.     Denial of Continuance*

Defendant argues that the trial court erred by denying his request for a continuance after a subpoenaed alibi witness failed to appear at trial.  Defendant asserts that the denial of a continuance "irreversibly prejudiced" Defendant and violated his right to present a defense, his right to a fair trial, and his right to due process.  The State responds that the

trial court properly exercised its discretion by denying Defendant's request for a continuance.

The grant or denial of a continuance rests within the sound discretion of the trial court. *State v. Rimmer*, 250 S.W.3d 12, 40 (Tenn.2008) (citing *State v. Odom*, 137 S.W.3d 572, 589 (Tenn.2004)). The decision to deny a continuance will be reversed by this court "only if it appears that the trial court abused its discretion to the prejudice of the defendant." *Odom*, 137 S.W.3d at 589 (citing *State v. Hines*, 919 S.W.2d 573, 579 (Tenn.1995)). "An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted." *Hines*, 919 S.W.2d at 579 (citing *State v. Wooden*, 658 S.W.2d 553, 558 (Tenn.Crim.App. 1983)). When a defendant claims that the denial of a continuance constitutes a denial of due process or the right to counsel, then he or she must establish actual prejudice. *Rimmer*, 250 S.W.3d at 40 (citing *Odom*, 137 S.W.3d at 589).

In this case, Defendant has not shown that the trial court's failure to grant a continuance denied him a fair trial or that there would have been a different result at trial if the continuance had been granted. The record reflects that Defendant filed three motions for a continuance in this case. All three of the motions mentioned an alibi witness, who was identified in the third motion as Defendant's former employer, David Williams. The third motion for a continuance was filed one week prior to trial and indicated that Defendant had contacted Mr. Williams eight days prior to trial and that Mr. Williams would be unable to testify at trial because he was working out of town. The motion further stated that Mr. Williams could testify that Defendant worked out of town for several weeks in 2015 when some of the offenses were alleged to have occurred. As pointed out by the State, Defendant's motion was clear that Mr. Williams' potential testimony about the dates Defendant was out of town was dependent on Mr. Williams' review of Defendant's past employment records which had not occurred at the time of the motion.

The day before trial, April 1, 2019, the court heard arguments on Defendant's third motion for a continuance. Defendant reiterated that Mr. Williams could not attend the trial and that he could potentially testify that Defendant was out of town for several weeks in 2015, when a portion of the alleged offenses in the case occurred. Although the indictment alleged that Defendant committed the offenses against the victim throughout the year in 2015, Defendant claimed that he had no reason to contact Mr. Williams until the State alleged in its bill of particulars that the offenses occurred on some weekends in 2015. As pointed out by the State, the record indicates that Defendant did not obtain an investigator until February 2019, and the investigator contacted Mr. Williams on March 25, 2019. Defendant's trial was conducted on April 2-3, 2019. As evidenced by his first two motions to continue, Defendant was aware of the potential need for an alibi witness before the bill of particulars was filed by the State.

The State argues that the trial court properly denied Defendant's motion for a continuance because Defendant failed to file an affidavit alleging "certain necessary facts" with the motion. We agree that in most cases, a defendant seeking a continuance on the basis of an absent witness must support the motion with an affidavit alleging the substance of the witness's testimony, the testimony's relevance and materiality to the defense, that the testimony was admissible and not cumulative, that the witness would be available at a later date, and that counsel exercised due diligence in trying to obtain the witness's presence at trial. *State v. Dykes*, 803 S.W.2d 250, 257 (Tenn. Crim. App. 1990), *overruled on other grounds*; *State v. Bennett*, 798 S.W.2d 783, 787-88 (Tenn. Crim. App. 1990); *State v. Frahm*, 737 S.W.2d 799, 802 (Tenn. Crim. App. 1987). "Failure to file the motion in proper form may be a ground for denial." *State v. Zirkle*, 910 S.W.2d 874, 884 (Tenn. Crim. App. 1995). This court has also recognized, however, that the lack of a written affidavit is not always controlling. *State v. Edward Mitchell*, No. W1990-01314-CCA-R3-CD, 2001 WL 204180 (Tenn. Crim. App., at Jackson, Mar. 1, 2001); *State v. Alvin Glenn Hughes*, No. 02C01-9208-CR-00183, 1993 WL 193712 (Tenn. Crim. App., at Jackson, June 9, 1993). "Cases relying on the mandatory filing of an affidavit in support of a motion for a continuance rely primarily on case law decided before the adoption of the Tennessee Rules of Criminal Procedure." *Hughes*, 1993 WL 193712, at *4. Tennessee Code Annotated section 40-18-103(c) provides that the trial court may grant a continuance upon "good cause shown." *State v. John Edward Lynch*, No. M2010-02481-CCA-R3-CD, 2012 WL 3679575, at *7 (Tenn. Crim. App., at Nashville, Aug. 24, 2012).

Notwithstanding Defendant's failure to file an affidavit in support of his motion for a continuance, which alone would be sufficient to deny the motion, Defendant has not shown that the trial court abused its discretion in denying his motion for a continuance.

First, Defendant has not shown sufficient facts to establish the relevance and materiality of Mr. Williams' testimony. At the hearing on Defendant's request for a continuance, defense counsel asserted that Mr. Williams told her that Defendant worked for him in 2015 and that Defendant was out of town "a lot" during that time. Mr. Williams did not have any specific dates and said that he would need to meet with his accountant and look at his employment records which would take a few weeks to do. At the hearing, trial counsel said: "And again, he can provide an alibi for, we think several of these weekends that these events were supposed to have happened." The prosecutor then noted that the State had never provided specific dates or weekends that the offenses occurred and that Defendant "has had notice that these have occurred for that three-year period since this [trial] has been set, and this has been set several times now at this point." The following exchange took place at the hearing:

> THE COURT: I'm reading the State's response to defendant's motion for bill of particulars, so that is, in effect, a bill of particulars. September 11, 2013, through September 13, 2016, so

it's three and a quarter years.  All right.  Your alibi witness can say what?

[Defense Counsel]:     That during the year 2015, he was gone for several months, sometimes several weeks to possibly a month or two months at a time.  And when they say it happened every weekend or every other weekend, that's - -

THE COURT:          But.  They are not saying that.

[Defense Counsel]:     Is that not in that paper?

THE COURT:          Not what I'm looking at.

[The Prosecutor]:     In the second paragraph, I think she – what she's referencing to.  And actually, the State even made note - -
THE COURT:          Okay.

[The Prosecutor]:     - - and is the one that said that we are aware that the defendant was gone for several weekends or months, so that went into our calculation of the counts that were ultimately charged, you Honor.

THE COURT:          However, she - -

[Defense Counsel]:     Your Honor, if that's - -

THE COURT:          - - also disclosed that [Defendant] would not be in town for two months in the summer of this year.

[Defense counsel]:     Your Honor, there is another document.

THE COURT:          Okay.   What I'm looking at was filed February the 8th of this year.  It is captioned, State's response to defendant's motion for bill of particulars.  Comes now the State, and the next paragraph, as to counts pertaining to the victim [. . . .]  The events occurred every weekend from September 11 to December 13.
[Defense counsel]:     And then I think the next sentence says every - -

THE COURT:          Then you try to - - then there is a – I guess a disclaimer for a couple of weeks - - couple of months for the

summers. So you're saying that your alibi witness can say more than that?

[Defense counsel]: I believe so, your Honor. He has to look at his employment records. He - - all he knows without looking at those detailed records is that he was gone several – for several weeks to months at a time. He - - it's been three years, he doesn't know specific times until he gets into his employment records.

Furthermore, Defendant has not shown that he was diligent in attempting to obtain the presence of Mr. Williams at trial. As pointed out by the State, Defendant waited more than two years after the return of the initial indictment and approximately five months after the return of the superseding indictment to contact an investigator to locate Mr. Williams. Contact with Mr. Williams was not made until approximately eight days before trial. Defendant suggests that he did not have reason to contact Mr. Williams until after the bill of particulars was filled alleging that some of the offenses occurred on the weekends. However, the initial indictment alleged that he touched the victim's intimate parts between January 2012 and December 2016, and the superseding indictment amended the time period of the offenses to September 2013 to December 2016. This would have included any time that Mr. Williams might have testified that Defendant was working out of town. Therefore, as argued by the State, Mr. Williams should have been identified as an alibi witness before March 26, 2019, when Defendant requested a continuance because Mr. Williams was unavailable for trial.

Finally, Defendant has not demonstrated that he was prejudiced by the trial court's failure to grant a continuance. Defendant did not present Mr. Williams as a witness at the hearing on the motion for new trial nor did he present any other evidence as to what Mr. Williams' testimony would have been concerning Defendant's employment records. Additionally, at trial, Defendant testified that in 2015 he worked for Star Construction who paid their employees in cash and that he did not have any employment records. Defendant is not entitled to relief on this issue.

II. *Use of a Therapy Dog During Trial*

Defendant contends that trial court erred in allowing the victim to testify at trial with the assistance of a therapy dog because the trial court did not hold an evidentiary hearing concerning the dog's qualifications and necessity of its use by the victim. Defendant further argues that the dog was "paraded" in and out of the courtroom, "in front of the jury in blatant defiance of this Court's directive." The State asserts that the trial court did not abuse its discretion in allowing the victim to use a therapy animal at trial.

- 14 -

Rule 611 of the Tennessee Rules of Evidence charges the trial court with "exercis[ing] appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel." *See State v. Cazes*, 875 S.W.2d 253, 260 (Tenn. 1994). The advisory commission comments to Rule 611 of the Tennessee Rules of Evidence provides:

> Nothing in these rules prohibits the court in its inherent authority from permitting a **suitable animal**, toy, or support person to accompany a witness who is shown to be at risk or unable to communicate effectively without the aid of such comfort. *See State v. Juan Jose Reyes*, No. M2015-00504-CCA-R3-CD, 2016 WL 3090904 (Tenn. Crim. App., May 24, 2016), perm. app. denied (Tenn. Sept. 23, 2016).

Tenn. R. Evid. 611 (2017 Advisory Comment) (emphasis added).

In *State v. Reyes*, 505 S.W.3d 890, 896 (Tenn. Crim. App. 2016), the sole case in Tennessee addressing the use of a therapy dog at trial, which was referred to in the case as a "facility" dog, this court, relying on *State v. Dye*, 309 P.3d 1192, 1198 (Wash. 2013), *People v. Chenault*, 227 Cal. App. 4th 1503 (Cal. Ct. App. 2014), and *People v. Tohom*, 969 N.Y.S. 2d 123 (NY App. Div. 2013), pointed out that "[w]hile the cases involving the use of a [therapy] dog during trial are not plentiful, it is clear that the evolving law permits their use." In *Reyes*, the trial court permitted the minor victim of a sexual offense to testify at trial with use of a therapy dog. The court in *Reyes* conducted a pretrial hearing on the defendant's motion in limine concerning the dog's presence in the courtroom during the victim's testimony. Testimony concerning the dog's qualifications and its effect on the minor witness was presented at the hearing. The State explained at the hearing that the therapy dog would not be taken in or out of the courtroom in the jury's presence. *Id.* at 896. The State also indicated that the dog would be positioned in the witness stand in such a manner that it would be partially hidden from the jury's view. *Id.* Furthermore, the trial court instructed the jury to make no inferences concerning the therapy dog's presence nor to allow sympathy to arise from the dog's presence. *Id.* at 898.

In the present case, the State filed a pretrial motion to allow use of a therapy dog by the victim at trial. In the motion, the State noted that the therapy dog named Lucia "is trained to accompany individuals in public settings, including victims that suffer from traumatic experience." The motion further stated that the "victims in this case appear less apprehensive and fearful of the judicial process when they have been around Lucia." Additionally, "[w]hen asked, the victims have stated they feel more comfortable when Lucia is present." Defendant filed a motion opposing the State's motion to allow use of the therapy dog. At one of the hearings on the State's motion, the prosecutor explained to the trial court that the witness stand had been altered in such a way as to keep Lucia mostly out of the jury's sight. In allowing use of the dog, the trial court noted stated: "I'm gonna

- 15 -

explain to the jury what the dog is, so it is sight, seen, whatever. I mean we just - - we're gonna have to make it a - - we can't pretend it's not there, so I will give an instruction."

The trial court in this case did not abuse its discretion by allowing Lucia to accompany the victim during her testimony at trial. Although the trial court did not conduct a hearing and make explicit findings concerning Lucia's qualifications and the necessity of the dog's use during trial, this is not mandated by *Reyes* or by Rule 611 of the Tennessee Rules of Evidence. The State's motion set forth that Lucia was trained to accompany victims who suffer from traumatic experience and further set out Lucia's effect on the victim in this case.

We disagree with Defendant's characterization that the Lucia was paraded "in and out of the courtroom, in front of the jury, in blatant defiance of this court's directive." In *Reyes*, this court quoted the court in *Chenault*, in which the court explained that the trial court should "attempt to make the presence of the support dog as unobtrusive and as least disruptive as reasonably possible." *Reyes*, 505 S.W.3d at 896 (quoting *Chenault*, 227 Cal. App. 4th at 1517). In this case, the witness stand was rearranged to limit the jury's view of the dog. While Lucia was brought into the courtroom in front of the jury, there is nothing in the record to indicate that this was done in an obtrusive or disruptive manner. Also, the record is not clear as to whether the dog left the courtroom in front of the jury. At the hearing on the motion for new trial, the trial court specifically stated that it did not recall Lucia "having any play in a question by the jury or anything of that nature." The trial court further noted that the dog's presence at trial was a "very neutral event and would not raise error that – that's steeped in prejudice" and that "the dog was basically a non-event." As for its reasoning for allowing Lucia to enter the courtroom in front of the jury, the trial court said:

> As far as bringing the dog in, I will do that every time because what I've learned over the years is you don't fool the jury. You don't hide the dog because somebody will see that dog and then all of a sudden, it takes on a life of its own. I would rather give full disclosure to what the dog is, let them see the dog, as I recall, this may have been one - - no, in Claiborne County she fell asleep. I mean, she just - - the dog just fell asleep. We forgot about her for about an hour. My point is having a jury wonder about what this animal or a stuffed animal or whatever it is, is a whole lot worse than just telling them up front, this is what this animal does, this is why it's here, you are not to place any significance on it, you're not to have any - - it should not have any [e]ffect on your weighing the credibility of the witnesses. It's simply here to draw comfort for this particular witness and can be drawing comfort for any witness. I'll stand on that one all day long. I guess I want to be in the record, because I - - fooling the jury is a mistake. You don't leave shells left to turn

- 16 -

over for a jury because they will wonder about it. I've had too many questions from juries come in about what about this. You know, we didn't - - we didn't explain that, and that potentially can lead to bad verdicts. As far as I recall, this left no questions.

The trial court's logic was not incorrect or unreasonable. Additionally, as was done in *Reyes*, the trial court gave the jury a special instruction concerning use of the therapy dog:

> The law allows either the prosecution or the defense to use a facility dog during the testimony of witnesses. This dog is not a pet, does not belong to any witness. It is a highly trained professional animal available for use by either side. The presence of the facility dog is in no way to be interpreted as reflecting upon the credibility of any witness. You may not draw any inference either favorably or negatively for or against either the prosecution or the defense because of the dog's presence and should attach no significance to the use of a facility dog by any side or witness.
>
> You may also – you also may not allow any sympathy or prejudice to enter into your consideration of the evidence during deliberations merely because of the use of a facility dog.

*See Reyes*, 505 S.W.3d at 897. Jurors are presumed to follow the instructions of the trial court. *State v. Reid*, 164 S.W.3d 286, 342 (Tenn. 2005). The trial court did not abuse its discretion by allowing the victim to testify with the assistance of a therapy dog. Defendant is not entitled to relief on this issue.

### III. Playing of the Victim's Entire Forensic Interview During Trial

Defendant contends that the trial court erred in allowing the entire video recording of the victim's forensic interview to be played for the jury because it improperly bolstered the victim's testimony. He also argues that the trial court should have excluded the recording under Tennessee Code Annotated section 24-7-123. The State argues that under the rule of completeness, the trial court did not abuse its discretion in allowing the entire recording of the forensic interview to be played for the jury.

This court reviews the admission of evidence at trial for an abuse of discretion. *State v. Hester*, 324 S.W.3d 1, 59 (Tenn. 2010). The trial court abuses its discretion when it applies "an incorrect legal standard or reaches a conclusion that is illogical or unreasonable and causes an injustice to the party complaining." *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007) (internal quotation marks omitted).

During the victim's cross-examination in this case, defense counsel requested to play portions of the victim's forensic interview to impeach the victim's trial testimony. At trial, the victim testified that Defendant touched her skin underneath her clothing; however, in the forensic interview, the victim repeatedly said that she did not know if Defendant touched her skin underneath her clothing. The trial court took the matter under advisement and cross-examination continued. At that point, defense counsel attempted to impeach the victim using the transcript of her testimony from the preliminary hearing during which she said that she remembered Defendant touching her vagina over her clothing. After the victim's cross-examination concluded, the trial court gave the jury the following instruction:

> A witness may be impeached by proving that he or she has made some material statements out of court which are at variance with his or her evidence on the witness stand; however, proof of such prior inconsistent statements may be considered by you only for the purpose of testing the witness' credibility and not as substantive evidence of the truth of the matter asserted in these statements.
>
> Further, a witness may be impeached by a careful cross-examination involving the witness in contradictory, unreasonable and improbable statements. However, immaterial discrepancies or differences in the statements of witnesses do not affect their credibility unless it should plainly appear that some witness has willfully testified falsely.

During a bench conference concerning the playing of the video of the forensic interview, Defense counsel indicated that the interview contained "pretty major" inconsistencies and requested to play only the portions of the interview that were inconsistent with the victim's trial testimony that Defendant touched her underneath her clothing. In a subsequent jury-out hearing on the matter, the State argued that the entire video could be played for the jury pursuant to Rule 106 of the Tennessee Rules of Evidence. At one point during the hearing, the trial court stated: "Do you not think that once a witness[ ] is attacked through impeachment that the proponent of that witness cannot buttress with consistent statements? That is the law. That's the law, I mean." The trial court concluded that the entire video of the forensic interview would be played for the jury.

The trial court did not abuse its discretion in allowing the entire video of the victim's forensic interview to be played for the jury. The video was not admitted as substantive evidence. Therefore, as argued by the State, the video was properly admitted under Tennessee Rule of Evidence 106, often referred to as the rule of completeness, which provides:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time

of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Tenn. R. Evid. 106. Our supreme court has stated that Rule 106 is "intended to ensure that the jury can assess related information without being misled by considering only portions of an item of evidence." *State v. McCaleb*, 582 S.W.3d 179, 187 (Tenn. 2019) (citing *State v. Hartman*, 42 S.W.3d 44, 61 (Tenn. 2001)). Rule 106:

> reflects a concern for fairness and is designed to let the jury assess related information at the same time rather than piecemeal. This should help the jury avoid being misled by hearing only partial information about a writing or recorded statement. Moreover, it will assist the jury in assessing the weight to be given to the written or recorded statement by permitting the jury to consider at the same time other relevant writings and recordings.

Neil P. Cohen, et al., *Tennessee Law of Evidence* § 1.06[2][a] (6th ed. 2011) (footnotes omitted); *see also State v. Torres*, 82 S.W.3d 236, 252 (Tenn. 2002). Evidence admitted under Rule 106 must be relevant and either explain or qualify the proof already admitted. *State v. Vaughan*, 144 S.W.3d 391, 407 (Tenn. Crim. App. 2003).

Furthermore, the video, which contained prior consistent statements by the victim, was properly played for the jury to rehabilitate the victim's credibility after it was impeached by Defendant on cross-examination by use of the preliminary hearing transcript. Defendant requested to further impeach the victim's credibility by use of the video of the forensic interview which also contained prior inconsistent statements. Prior consistent statements are generally inadmissible to bolster a witness's credibility. *State v Hodge*, 989 S.W.2d 717, 725 (Tenn. Crim. App. 1998) (citing *State v. Braggs*, 604 S.W2d 427, 433 (Tenn. Crim. App. 1980).

> However, three exceptions to this general rule exist. First, a "prior consistent statement may be admissible . . . to rehabilitate a witness when insinuations of recent fabrication have been made or when deliberate falsehood has been implied." *State v. Benton,* 759 S.W.2d 427, 433 (Tenn. Crim .App. 1988). In such a situation, a prior consistent statement is allowed to show that the trial testimony is consistent with what the witness said when no influence or motive to lie existed. *State v. Sutton,* 155 Tenn. 200, 204, 291 S.W. 1069, 1070 (1927). Second, a prior consistent statement may be admissible when a witness is impeached through the introduction of a prior inconsistent statement that suggests that the witness's testimony was either fabricated or based upon faulty recollection. *State v. Meeks,* 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993).

Moreover, "the impeaching attack which allows for corroboration may occur during cross-examination of the witness. . . . Under such circumstances, the [witness's] statement made before the inconsistent statement but which was consistent with his trial testimony" is admissible to rehabilitate the witness. *Id.* (citations omitted). Third, a prior inconsistent statement may be admissible when a witness's prior statement is used out of context to cross-examine the witness. *State v. Boyd*, 797 S.W.2d 589, 593-94 (Tenn.1990).

*State v. Charles Sherman Thaxton*, No. E1999-02091-CCA-R3-CD, 2000 WL 1499440, at *3 (Tenn. Crim. App., at Knoxville, Oct. 10, 2000).

In this case, the victim's consistent statements contained in the video are admissible under the second exception. The victim's credibility was attacked on cross-examination about her inconsistent statements at the preliminary hearing where she testified that Defendant did not touch her underneath her clothing after she testified at trial that Defendant did touch her underneath her clothing. Defendant requested that the video be played during cross-examination to further impeach the victim's credibility by showing that she also told the forensic interviewer that she did not know if Defendant touched her underneath her clothing. *Id*. at *4.

Defendant contends that the trial court improperly admitted the entire video of the forensic interview because the court failed to consider the factors listed under Tennessee Code Annotated section 24-7-123. The statute provides in pertinent part that a trial court has the discretion to admit "a video recording of an interview of a child by a forensic interviewer containing a statement made by the child under thirteen (13) years of age describing any act of sexual contact performed with or on the child by another" in a trial arising out of that sexual contact if the trial court is "reasonably satisfied" in a pretrial hearing that "particularized guarantees of trustworthiness" of the video are met. In making such a determination, the trial court is to consider a non-exhaustive list of factors. T.C.A. § 24-7-123 (A)–(K). It is within the trial court's discretion to admit a video recording of a forensic interview if, after a pretrial hearing and consideration of the various factors listed in the statute and others the court may deem appropriate, the court is reasonably satisfied that the recording possesses guarantees of trustworthiness. *See State v. McCoy*, 459 S.W.3d 1, 10 (Tenn. 2014). However, in the present case, the requirements of Tennessee Code Annotated section 24-7-123 do not apply because the trial court did not admit the forensic interview as substantive evidence. *See State v. Phillip Michael Martinez*, No. W2019-02033-CCA-R3-CD, 2021 WL 2949514, at *15 (Tenn. Crim. App., at Jackson, July 14, 2021) *no perm. app. filed* (Trial court did not make the findings required by T.C.A. § 24-7-123 in order for the recording of the forensic interview to be admitted as substantive evidence).

In any event, even if it was error for the trial court to allow the entire forensic interview to be played for the jury, any error was harmless. Immediately before the forensic video was played, the trial court further instructed the jury:

> THE COURT: Before we – this is played for you, I have some comments to buttress what I – the instruction that I gave you. I want - - I'm talking to the record, and I'm talking to the jury, be very clear. The video that is about to be played is not sworn, it is not the proof in this case. It is being offered to show inconsistencies raised by the Defense and consistencies raised by the State. I want to be very clear that you are not to try this case on this this video. Do you understand what I'm saying?
>
> JURORS: (Indicating yes).
>
> THE COURT: You will try the case based on the proof that you heard in the Courtroom. The video is offered for the purposes of testing the credibility of that particular witness. Do you understand that?
>
> JURORS: (Indicating yes).
>
> THE COURT: And I'm not - - and I am talking to you, but I'm talking to the record as well. I need to be as crystal clear here as I possibly can. Trying the case on its merits with this video would be inappropriate. It will not be entered as an exhibit, it's simply for your viewing to test the credibility of the witness that you heard yesterday, okay? All right. With that in mind, let's play the video.

Jurors are presumed to follow the instructions of the trial court. *Reid*, 164 S.W.3d at 342. Defendant is not entitled to relief on this issue.

### IV. *Denial of Defendant's Request for a Mistrial*

Defendant argues that the trial court erred by denying his request for a mistrial after the State's rebuttal witness "made repeated prejudicial propensity statements about [Defendant's] other victims and other cases" and gave no curative instruction concerning the testimony. The State responds that there was no manifest necessity for a mistrial.

A trial court's decision to grant or deny a motion for mistrial is within the providence of that court. An appellate court will only disturb a trial court's ruling on the motion when there has been an abuse of discretion by the trial court. *State v. Nash*, 294

S.W.3d 541, 546 (Tenn. 2009). A trial court abuses its discretion when it "applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010).

A trial court should declare a mistrial "only when there is a 'manifest necessity.'" *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996) (quoting *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977)). "'In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did.'" *State v. Robinson*, 146 S.W.3d 469, 494 (Tenn. 2004) (quoting *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)). A mistrial should be declared "to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *Williams*, 929 S.W.2d at 388. The defendant bears the burden of establishing that there was a manifest necessity for a mistrial. *Id*.

In determining whether a mistrial is necessary after a witness has testified about a defendant's alleged prior bad acts, this court has often considered: "(1) whether the improper testimony resulted from questioning by the state, rather than having been a gratuitous declaration, (2) the relative strength or weakness of the state's proof, and (3) whether the trial court promptly gave a curative instruction." *State v. Demetrius Homes*, No. E2000-02263-CCA-R3-CD, 2001 WL 1538517, at *4 (Tenn. Crim. App., at Knoxville, Nov. 30, 2001) (citing *State v. Mounce*, 859 S.W.2d 319, 322 (Tenn. 1993); *State v. William Dotson*, No. 03C01-9803-CC-00105, 1999 WL 357327, at *4 (Tenn. Crim. App. June 4, 1999)).

In this case, the State's rebuttal witness, Marita Bennett, a DCS employee who worked on the victim's case, was asked if she spoke with Defendant after interviewing the victim. Ms. Bennett responded that she had previously spoken to Defendant "on a separate case." The prosecutor then asked Ms. Bennett if she had discussed the victim as it pertained to a separate case, and she responded that she had done so. Defendant then objected, and the trial court sustained the objection. No request for a mistrial was made at that point. Next, the State asked what date Ms. Bennett initially spoke with Defendant about the victim's case and if she had spoken to Defendant or anyone else about the victim's case on a specific date. Rather than answering the question asked by the State, Ms. Bennett testified that she had spoken with "another victim" who was the victim's sibling. The trial court immediately stopped the trial and excused the jury from the courtroom. At that point, Defendant made a motion for a mistrial which was denied by the trial court.

We conclude that the trial court did not abuse its discretion in refusing to declare a mistrial. The State did not elicit the testimony; instead, the witness volunteered the testimony. Although the trial court did not give the jury a curative instruction, the record reflects that Defendant did not request one. In fact, during the jury-out hearing following Ms. Bennett's reference to "another victim," defense counsel said that she felt "there [was]

no way to cure what's been done." The State's proof against Defendant was strong considering the victim's testimony, some of which was corroborated by J.W.'s testimony and the recorded phone call during which Defendant admitted to inappropriately touching the victim on at least one occasion, and he offered to pay the victim's aunt and uncle to stay silent. Accordingly, we conclude that the trial court did not err in refusing to grant a mistrial in this case. Defendant is not entitled to relief on this issue.

## V.     Sufficiency of the Evidence

Defendant contends that the evidence was insufficient to support his conviction for rape of a child because there was no evidence of penetration and his conviction for thirty of the counts of aggravated sexual battery because the victim did not offer any testimony as to those counts. In a related issue, Defendant also contends that the jury's verdict was improper because the jury failed to specify which acts of sexual abuse on which it relied for his continuous sexual abuse of a child conviction. The State asserts that the evidence was sufficient to support the convictions and that continuous sexual abuse of a child statute does not require the jury to specifically identify the three acts on which it relied for the conviction as long as the jury unanimously agrees that Defendant committed three or more acts of sexual abuse.

When a defendant challenges the sufficiency of the evidence, this court is obliged to review that claim according to certain well-settled principles. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether *any* rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Rape of a child is defined as "the unlawful sexual penetration of a victim by the defendant . . . if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's . . . body, . . ." T.C.A. § 39-13-501(7).

"Aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim" where the victim is less than thirteen years of age. T.C.A. § 39-13-504(a)(4). "'Sexual contact' includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" *Id.* § 39-13-501(6) (2018). "'Intimate parts' includes semen, vaginal fluid, the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" *Id.* at (2).

As to Defendant's rape of a child conviction, Defendant contends that the State failed to prove that there was penetration. However, the victim testified that on one occasion, Defendant touched her while in the living room, and his fingers went in between the folds of her vagina. In the light most favorable to the State, this testimony is sufficient to support Defendant's conviction for rape of a child. Our supreme court has explained that because sexual penetration is defined as any slight intrusion into the female sexual organ, "'[i]t is not necessary that the vagina be entered or that the hymen be ruptured; the entering of the vulva or labia is sufficient.'" *State v. Bowles*, 52 S.W.3d 69, 74 (Tenn. 2001) (quoting *Hart v. State,* 21 S.W.3d 901, 905 (Tenn. 2000)). There is ample evidence to support the element of penetration and the conviction.

As to Defendant's convictions for aggravated sexual battery, Defendant argues that the victim testified to at most fifty-one incidents of aggravated sexual battery rather than eighty-one, and therefore, thirty of his convictions should be dismissed.

The State relied on so-called "generic evidence" in support of Defendant's convictions for aggravated sexual battery. In cases of generic prosecutions, the "victims describe[ ] with clarity the type of sexual battery perpetrated on them but fail[ ] to identify specifically when each alleged act occurred." *State v Qualls,* 482 S.W.3d 1, 11-12 (Tenn. 2016). The victim's generic testimony must (1) describe "*the kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct . . ."; (2) identify "the *number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a month' or 'every time we went camping')"; and (3) designate "*the general time period* in which these acts occurred (e.g., 'the summer

- 24 -

before my fourth grade,' or 'during each Sunday morning after he came to live with us') to assure the acts were committed within the applicable limitation period." *Id.* at 13 (*quoting People v. Jones*, 792 P.2d 643, 655 (1990)) (*emphasis* in original).

> Although "[a]dditional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony," such details "are not essential to sustain a conviction." [*Jones*], 270 Cal.Rptr. 611, 792 P.2d at 656. "[T]he particular details surrounding a child molestation charge are not elements of the offense and are unnecessary to sustain a conviction." *Id.,* 270 Cal.Rptr. 611, 792 P.2d at 655. "To hold that such testimony, however credible and substantial, is inadequate to support molestation charges would anomalously favor the offender who subjects his victim to repeated or continuous assaults." *Id.,* 270 Cal.Rptr. 611, 792 P.2d at 645; *see also State v. Wilcox,* 808 P.2d 1028, 1033 (Utah 1991). "With the exception of those who happen to select victims with better memories or who are one act offenders, the most egregious child molesters effectively would be insulated from prosecution." *Brown IV,* 780 P.2d at 886. Therefore, the *Jones* Court explained, if the victim's testimony satisfies the foregoing specificity standards, the evidence would be sufficiently specific to allow the jury to determine guilt beyond a reasonable doubt. 270 Cal.Rptr. 611, 792 P.2d at 655.

*Qualls*, 482 S.W.3d at 13.

The victim in this case testified that she began visiting her mother and Defendant shortly after her seventh birthday in 2013. She described Defendant as touching her vagina with his hand while she was on the couch, in the bed, and riding an ATV. While the victim was occasionally able to provide specific details about certain incidents, she had difficulty recalling the specifics of the other incidents of sexual abuse. However, the victim specifically testified that she visited her mother and Defendant at least once a week during the period of time between her seventh birthday in 2013 and December 2016. She further testified that she was alone with Defendant at least one time each time that she visited her mother and Defendant, and she could not remember a time when she visited them that Defendant did not touch her vagina.

The indictment charged Defendant with rape of a child in counts one through twenty-seven "while she was wearing clothes and on a couch in the living room" in Defendant's home, in counts twenty-eight through fifty-four "while she was wearing clothes and lying down in a bed in the bedroom" in Defendant's home, and in counts fifty-five through eighty-one "while she was wearing clothes and on an ATV" with Defendant.

- 25 -

The victim testified that defendant touched her on the couch between ten and fifteen times, in the bedroom approximately twenty times, and ten times or less while riding the ATV.

As set out above, we conclude that the evidence was sufficient to support the conviction for rape of a child occurring on the couch. However, based on the specific locations identified in the indicted counts and victim's testimony of the specific number of times Defendant touched her while she was in each location, we conclude that the evidence is sufficient to support fourteen of Defendant's convictions for aggravated sexual battery occurring on the couch as charged in counts two through fifteen, twenty of Defendant's convictions for aggravated sexual battery occurring in the bedroom as charged in counts twenty-eight through forty-seven, and ten of Defendant's convictions for aggravated sexual battery occurring on the ATV as charged in counts fifty-five through sixty-four. Accordingly, the evidence is insufficient to support counts sixteen through twenty-seven, counts forty-eight through fifty-four, and counts sixty-five through eighty-one.

Defendant also asserts that the jury's verdict was improper because it did not specify which acts of sexual abuse that it relied on for his conviction for continuous sexual abuse of a child. The Child Protection Act, Tennessee Code Annotated section 39-13-518, permits multiple acts of sexual abuse against one or more child victims to be charged as a single offense. The statute creates the offense of continuous sexual abuse of a child and provides that a person commits said offense who:

> (1) Over a period of ninety (90) days or more, engages in multiple acts of sexual abuse of a child as defined in subdivision (a)(1)(A)(i) or (a)(1)(A)(ii); or
>
> (2) Over a period of less than ninety (90) days, engages in multiple acts of sexual abuse of a child as defined in subdivision (a)(1)(A)(iii).

T.C.A. § 39-13-518(b)(1), (2). Multiple acts of sexual abuse of a child means engaging in three or more incidents of sexual abuse of the same child on separate occasions, or engaging in five or more incidents of sexual abuse of two or more different children on separate occasions. *Id.* § 39-13-518(a)(1)(A)(i), (iii). Rape of a child and aggravated sexual battery both qualify as sexual abuse of a child. *Id.* § 39-13-518(a)(2)(C), (D). As relevant here, subsection (e) sets out that the jury must unanimously agree that the defendant:

> (1)(A) During a period of ninety (90) or more days in duration, committed three (3) or more acts of sexual abuse of a child; or

(B) During a period of less than ninety (90) days in duration, committed five (5) or more acts of sexual abuse of a child against at least two (2) different children; and

(2) Committed at least three (3) of the same specific acts of sexual abuse within the specified time period if prosecution is under subdivision (e)(1)(A) and at least five (5) of the same specific acts of sexual abuse within the specified time period if prosecution is under subdivision (e)(1)(B).

*Id.*

While the statute mandates that the jury unanimously agree that Defendant committed three or more acts of sexual abuse of child during a period longer than ninety days, there is no requirement for the jury to specify which three acts they relied on to support Defendant's continuous sexual abuse of a minor conviction. *See* Tenn. Op. Att'y Gen. No. 13-35, 2013 WL 1942385, at *3 (2013) (the statute "merely requires the jury unanimously find that a requisite number of acts of sexual abuse of one or more children occur within a defined time frame," and that "the requirement of jury unanimity does not preclude a conviction where the jury does not agree as to which acts took place so long as it unanimously agrees that the defendant performed the requisite number of acts during the necessary time period.").

The State is required by the statute to file a notice at least thirty days prior to trial identifying which acts of sexual abuse being relied on for the continuous sexual abuse charge. T.C.A. § 39-13-518(d),  In the present case, the State provided proper notice that it was relying on counts one through eighty-two of the indictment as the predicate offenses to support the continuous sexual abuse count in count eighty-three of the indictment.  The jury clearly unanimously agreed that Defendant committed three or more acts of sexual abuse of child during a period longer than ninety days by finding him guilty of one count of rape of a child and eighty-one counts of aggravated sexual battery.  The jury was not required to unanimously agree on which three specific acts of those counts supported the continuous sexual abuse conviction.  Therefore, Defendant was properly convicted of continuous sexual abuse of a child.  He is not entitled to relief on this issue.

*Sentencing*

Defendant argues that the trial court erred by imposing more than the minimum sentence for his conviction for continuous sexual abuse of a child.  The State responds that the sixty-year sentence "comported with the sentencing act and was not an abuse of discretion."

Regarding sentencing under the continuous sexual abuse of a child statute, Tennessee Code Annotated section 39-13-518(f) provides:

- 27 -

In the event that a verdict of guilty is returned on a separate count that was included in the notice of separate incidents of sexual abuse of a child and the jury returns a verdict of guilty for a violation of this section, at the sentencing hearing the trial judge shall merge the separate count into the conviction under this section and only impose a sentence under this section.

The trial court has broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any enhancement and mitigating factors, have been properly addressed." *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.* at 707. In *State v. Caudle*, our supreme court clarified that the "abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." 388 S.W.3d 273, 278-79 (Tenn. 2012). Under the Sentencing Act, trial courts are to consider the following factors when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

> (1) The evidence, if any, received at the trial and the sentencing hearing;
> (2) The presentence report;
> (3) The principles of sentencing and arguments as to sentencing alternatives;
> (4) The nature and characteristics of the criminal conduct involved;
> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
> (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee;
> (7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing; and
> (8) The result of the validated risk and needs assessment conducted by the department [of Correction] and contained in the presentence report.

T.C.A. § 40-35-210(b).

Trial courts are "required . . . to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the

sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)).  Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10.  Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only.  *See* T.C.A. § 40-35-114; *see also Bise*, 380 S.W.3d at 701.  Moreover, a trial court is "guided by - but not bound by - any applicable enhancement factors when adjusting the length of a sentence [,]" and its "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706.

In this case, the trial court's sentencing order reflects that the trial court in sentencing Defendant, considered all appropriate principles set forth in T.C.A. § 40-35-210(b).  The trial court applied four enhancement factors including: Defendant's previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; the offense involved a victim and was committed to gratify Defendant's desire for pleasure or excitement; Defendant, before trial or sentencing failed to comply with the conditions of a sentence involving release into the community; and Defendant committed the offense while released on probation.  T.C.A. § 40-35-114 (1), (7), (8) and (13).  Defendant contends that the trial court erred by applying factor (7) to his sentence.  He does not contest application of the remaining factors, and the record reflects that they were appropriately applied.  The trial court did not apply any mitigating factors, and Defendant does not argue that any apply to his case.

As for application of factor (7), Defendant argues that it does not apply because all but one of the felonies underlying his conviction for continuous sexual abuse of a child were based on his eighty-one convictions for aggravated sexual battery.  He correctly notes that factor (7) cannot be applied to a conviction for aggravated sexual battery.  *State v. Hayes,* 899 S.W.2d 175, 185 (Tenn. Crim. App. 1995).  However, factor (7) can be applied to a conviction for rape of a child.  *State v. Osborne*, 251 S.W.3d 1, 26.  Since Defendant's conviction for continuous sexual abuse of a child was also based on the underlying felony of rape of child, the trial court appropriately applied factor (7) to his conviction.  However, as argued by the State, Defendant's sentence was appropriate even if the trial court erred by applying factor (7).

The trial court considered the relevant principles and sentenced Defendant to a within-range sentence for his conviction.  Because he was convicted of continuous sexual abuse of a child, in this case a Class A felony, Defendant was subject to a sentencing range of fifteen to sixty years.  Tennessee Code Annotated section § 39-13-518(g) provides:

> Notwithstanding any other law to the contrary, a person convicted of a
> violation of this section shall be sentenced from within the full range of

punishment for the offense of which the defendant was convicted, regardless of the range for which the defendant would otherwise qualify.

Defendant argues that the trial court should have sentenced him to the minimum sentence for his conviction. However, "[t]he application of a single enhancement factor can justify an enhanced sentence." *State v. John M. Banks*, No. M2019-00017-CCA-R3-CD, 2020 WL 5015888, at \*10 (Tenn. Crim. App., at Nashville, Aug. 25, 2020), *perm. app. denied* (Tenn. Dec. 2, 2020) (citing *State v. Bolling*, 75 S.W.3d 418, 421 (Tenn. Crim. App. 2001)). We also point out that the trial court would have been within its discretion to impose a maximum in-range sentence without finding any applicable enhancement factors, "as long as there are reasons consistent with the statutory purposes and principles of sentencing." *State v. Christopher Scott Chapman*, No. M2011-01670-CCA-R3-CD, 2013 WL 1035726, at \*9 (Tenn. Crim. App., at Nashville, Mar. 13, 2013) (citing *Bise*, 380 S.W.3d at 706; *State v. Carter*, 254 S.W.3d 335, 345-46 (Tenn. 2008)). The trial court did not abuse its discretion by sentencing Defendant to a sixty-year sentence for continuous sexual abuse of a child.

### VI. Cumulative Error

Defendant contends that he is entitled to a new trial because the cumulative effect of repeated constitutional violations denied him a fair trial. The State counters that Defendant has failed to demonstrate any error, therefore he is not entitled to cumulative error relief.

Our supreme court has stated:

> The United States Constitution protects a criminal defendant's right to a fair trial; it does not guarantee him or her a perfect trial. We have reached the same conclusion with regard to the Constitution of Tennessee. It is the protection of the right to a fair trial that drives the existence of and application of the cumulative error doctrine in the context of criminal proceedings. However, circumstances warranting the application of the cumulative error doctrine to reverse a conviction or sentence remain rare.

> The cumulative error doctrine is a jicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial.

*Hester*, 324 S.W.3d at 76-77 (Tenn. 2010) (citations omitted).

To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings. *State v. Herron*, 461 S.W.3d 890, 910 (Tenn. 2015) (citing *Hester*, 324 S.W.3d at 77). After considering each of Defendant's issues on appeal and finding error only on sufficiency of evidence related to specific counts of the indictment, we need not consider the cumulative effect of any alleged errors. Defendant is not entitled to relief on this issue.

## CONCLUSION

Based on foregoing analysis, we dismiss counts sixteen through twenty-seven, counts forty-eight through fifty-four, and counts sixty-five through eighty-one and remand for entry of amended judgments. In all other respects, we affirm the judgments of the trial court.

_____
JILL BARTEE AYERS, JUDGE